Billy V. HALL, et al. *v.* Monte J. STAHA, et al.
*v.* Dunhall Pharmaceuticals, Inc., Cross-Appellants

89-288                                     800 S.W.2d 396

Supreme Court of Arkansas
Opinion delivered November 19, 1990

674

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd.*, by: *John E. Pruniski* and *Dorcy Kyle Corbin*; and *Hendren & Hood*, for appellants.

*Estes, Estes & Gramling*, by: *Peter J. Estes, Jr.*, for appellee Monte J. Staha, Jimmy H. Hatfield, and MJS, Inc.

*Stephen E. Adams, Ltd.*, for MED-MAX Associates Limited Partnership.

*Stanley, Harrington & Mars*, by: *Roy E. Stanley*, for appellee/cross-appellant Dunhall Pharmaceuticals, Inc.

RICHARD F. HATFIELD, Special Justice. This is a consolidation of (1) an action by Monte J. Staha (Staha) and Jimmy H. Hatfield (Hatfield) challenging the election of directors of Dunhall Pharmaceuticals, Inc. (Dunhall), and (2) a shareholder derivative suit by Billy V. Hall, et al., alleging excess compensation, improper use of corporate assets and breaches of fiduciary duty by Hatfield and Staha as officers and directors.

Dunhall, which sells pharmaceuticals, was formed in 1960. In 1970, Hatfield and Staha, who were sales manager and president, respectively, entered into employment contracts with Dunhall to be renewed annually "unless the parties did not agree" to pay themselves a percentage of all net sales of the company. In 1973, Staha formed M.J.S., Inc., and Hatfield formed R.N.I., Inc., and each assigned his employment contract to his corporation. Dunhall's net sales rose from $327,039 in 1970 to $6,221,941 in 1987, and its shareholder equity account rose from $87,659 in 1970 to $1,694,896 in 1987. No dividends were ever paid to Dunhall shareholders. The employment contracts provided for the following percentages of Dunhall net sales to Hatfield and Staha each in the respective years: 1970 - six percent, 1973 - five percent, and 1982 - four percent. At the time of the contract revisions of the agreement with the Dunhall Board in 1973 and 1982, Hatfield and Staha did not own or control the majority of the Dunhall stock.

In March 1987, Hatfield, Staha and Hall, who together owned 48 percent of the outstanding Dunhall stock and were the only directors, received an offer from Jones Medical Industries, Inc., (JMI) to purchase their Dunhall stock, which was refused at the request of Staha in June, 1987. At a shareholders' meeting on May 11, 1987, a dispute as to the election of directors resulted in a lawsuit in June, 1987, challenging this election which was part of this consolidated action. On July 13, 1987, another offer was received by Hatfield, Staha and Hall from JMI to acquire all or substantially all of the total Dunhall stock for a sales price which would approximate $15 per share. This offer was withdrawn on August 31, 1987. Shareholders other than directors were never informed of either offer.

Hatfield and Staha formed MED-MAX Associates Limited Partnership, a Delaware limited partnership (MED-MAX) on July 7, 1987. Through their efforts and those of Dunhall salesmen, sufficient stock was acquired at $3 to $5 a share from then-Dunhall shareholders together with stock owned by Hatfield and Staha to constitute 50.5 percent of the outstanding stock of Dunhall. Hatfield, Staha and the other shareholders owning 50.5 percent of the Dunhall stock exchanged this stock for limited partnership interests in MED-MAX. Such solicitations ceased once control was obtained, and, thus, not all Dunhall shareholders were offered interests in MED-MAX. Hatfield and Staha were the general partners in MED-MAX and authorized by it to vote all Dunhall stock it owned. The employment contracts of Hatfield and Staha, through their individual corporations, M.J.S., Inc., and R.N.I., Inc., were assigned to MED-MAX in August, 1987.

The names of the Dunhall shareholders, who had transferred their stock for limited partnership interests in MED-MAX, were not of public record as of September 21, 1987, the next called shareholder meeting after May 11, 1987.

At the September 21, 1987, shareholders' meeting, Staha voted the MED-MAX stock to elect Hatfield and Staha directors together with Hall, who was elected by the other voting shareholders. Hall objected to Staha voting the Dunhall stock owned by MED-MAX on the basis that it constituted an illegal voting trust.

Consideration of the employment contracts was on the agenda for the June, 1987, board meeting and the September, 1987, shareholders' meeting, but was not acted upon at either meeting. These contracts required annual renewal "as long as the parties agreed." The last renewal date was October 1, 1986. Hatfield and Staha had previously opposed any change in these contracts.

Dunhall was profitable from 1970 until the fiscal year ending December 31, 1986, in which a loss of $138,593 occurred, followed by a loss of $487,215 for the fiscal year ending December 31, 1987. Hatfield's and Staha's employment contracts based on net sales provided for total compensation to them of $513,768 in 1986 and $497,754 in 1987.

On September 17, 1987, Hall and other shareholders filed a shareholder derivative action suit against Hatfield, Staha, their corporations, MED-MAX and Dunhall alleging that Hatfield and Staha received excessive compensation and payment by Dunhall for their personal expenses and breached their fiduciary duty. At the May, 1988, Dunhall shareholders' meeting, Hatfield, Staha and Hall were elected directors. Following this meeting, Hatfield and Staha voted for, and Hall against, continuing the employment contracts on the terms of the October 1, 1982, contract.

Sometime in 1982, Dunhall, at Staha's direction, initiated a procedure which resulted in excess sales collections. A salesman receiving cash for a sale with five percent discount would forward the check to Dunhall headquarters, which would also invoice the customer for the same amount *without* showing the payment. Many customers paid the same bill twice resulting in $9,000 to $10,000 per month receipts to Dunhall. In September, 1988, this accumulated total was in excess of $550,000. The funds were not returned to the customer unless specifically requested. Staha testified that the reason for this procedure was that Dunhall had insufficient support staff to properly account for these payments. Dunhall's certified public accountant, who audited the corporation annually, testified that a reserve was established for the refund of these funds based on experience of refund requests and that they were taken into income by Dunhall after two years if no repayment request was made.

The chancellor found that (1) the action challenging the election of directors was moot; (2) Dunhall should elect necessary directors according to its corporate documents; (3) Hatfield and Staha should pay Dunhall interest for personal use of corporate property; (4) the business judgment rule shielded actions of Hatfield and Staha regarding JMI proposals to purchase Dunhall stock; (5) change of the employment contract of Hatfield and Staha had not been considered by Dunhall shareholders or directors; (6) Hatfield and Staha did not breach their fiduciary duty to Dunhall by forming MED-MAX; (7) Staha did not breach his fiduciary duty to Dunhall shareholders by implementing and maintaining the double billing operation; (8) MED-MAX was not an invalid voting trust arrangement; and (9) Dunhall should pay $25,000 fees to the Hall's attorneys for

prosecuting the derivative action suit. Appellants appeal alleging error in findings 4 through 8. Dunhall cross-appeals finding 9.

■ In *Gries Sports* v. *Cleveland Browns Football*, 26 Ohio St. 3d 15, 496 N.E. 2d 959 (1986), a shareholders' derivative action, the Ohio Supreme Court held the directors were not entitled to the benefit of the business judgment rule under Delaware law. In discussing the applicability of the rule, the court said:

> The business judgment rule is a principle of corporate governance that has been a part of the common law for at least one hundred and fifty years. It has traditionally operated as shield to protect directors from liability for their decisions. If the directors are entitled to the protection of the rule, then the courts should not interfere with or second-guess their decisions. If the directors are not entitled to the protection of the rule, then the courts scrutinize the decision as to its intrinsic fairness to the corporation and the corporation's minority shareholders. The rule is a rebuttable presumption that directors are better equipped than the courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted with good faith.

■ Two elements must be satisfied in order for the rule to be invoked. First, its protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. Second, to invoke the rule's protection, directors have a duty to inform themselves of all material information reasonably available to them prior to making a business decision. Having become so informed, they must then act with requisite care in discharge of their duties. *Aronson* v. *Lewis*, 473 A.2d 805 (Del. 1984).

■ The application of the business judgment rule has never been addressed in prior decisions of this court. We believe the rule should be utilized as a tool of judicial review, and, accordingly, the business judgment rule is hereby adopted and will by applied by courts in Arkansas when deemed appropriate.

The evidence reflects that Hatfield and Staha were *not*

disinterested directors in dealing with the offer by JMI in July, 1987, to purchase all or substantially all of the Dunhall stock for the following reasons:

1. The chancellor found that Hatfield and Staha exercised good faith judgment in opposing the JMI offer in July, 1987, to acquire all or substantially all Dunhall stock on the basis that it would be hostile to the present Dunhall management. However, at the time this JMI proposal was made to purchase all Dunhall stock for a price of approximately $15 per share, purchases of Dunhall stock were being made, in a coordinated effort, by Hatfield, Staha and Dunhall salesmen at $3 to $5 a share with the purpose of gaining control of Dunhall.

2. The chancellor found that JMO did not intend to retain Hatfield and Staha in their positions at the salary provided in the existing employment contracts and would make other changes. There is no evidence that Hatfield and Staha communicated this offer to other Dunhall shareholders and little evidence that they thoroughly investigated the effect on Dunhall and its shareholders even though they had an obvious conflict of interest in probably losing their lucrative positions. The chancery court further found that the offer was only a "proposal," not a "binding offer."

Chancery cases are tried de novo on appeal, and we will not reverse the chancellor's findings unless clearly erroneous. *Conway Corp.* v. *Construction Engineers, Inc.*, 300 Ark. 225, 782 S.W.2d 36 (1989), *cert. denied,* ___U.S.___, 110 S. Ct. 1809 (1990). This court does not normally remand a case to chancery court, but rather we try the case de novo and render the decree that should be rendered below. The usual practice is to end the controversy by final judgment or by directions to the trial court to enter a final decree. This rule, however, is not imperative and this court, in the furtherance of justice, has the power to remand any case in equity for further proceedings, including hearing additional evidence. *Walt Bennett Ford* v. *Pulaski County Special School District*, 274 Ark. 208, 624 S.W.2d 426 (1981).

The evidence clearly shows that Hatfield and Staha had a conflict of interest, thus making the business judgement rule inapplicable. The chancery court was clearly erroneous in holding the business judgment rule protected the actions of Hatfield

and Staha regarding the JMI offer of July, 1987. The case is remanded for further proceedings to determine whether Hatfield's and Staha's conduct concerning the JMI offer of July, 1987, was in the best interests of Dunhall. If, after hearing additional evidence on this matter the trial court finds that Hatfield's and Staha's conduct was not in the best interests of Dunhall, the chancellor is instructed to determine any damage to appellants as a result of Hatfield's and Staha's actions.

The chancery court found that Hatfield's and Staha's employment contracts had not been considered by shareholders or directors and erroneously refused to "speculate" as to the directors' actions had the contracts been considered.

The question is one of the burden of proof of the "fairness" to Dunhall of the employment contracts. The situation changed dramatically once MED-MAX controlled over fifty percent of Dunhall stock and owned the employment contracts. The record reflects that Hatfield and Staha had opposed any change in the employment contracts since 1982 and voted in May, 1988, to continue the terms of the 1982 contracts. The first time at which the contracts could have been considered after problems giving rise to this litigation arose was October 1, 1987. After the May, 1987, shareholder's meeting, the evidence presents a real question about whether there was "agreement" of the parties. It is apparent that as of October 1, 1987, there was a dispute about whether the Dunhall shareholders' meeting on September 21, 1987, was properly held and voting of MED-MAX stock proper, which is covered later in this opinion. In any event, the directors had a fiduciary duty to consider the fairness of these employment agreements to Dunhall which were to be considered after October 1, 1987. At that time, Hatfield and Staha constituted two-thirds of the Dunhall board, and represented MED-MAX, owner of 50.5 percent of outstanding shares of Dunhall. Their actions before 1987 and in May, 1988, made it apparent that they, as Dunhall directors, would oppose any change in the employment contracts. MED-MAX benefited from continuing the existing contracts, whereas Dunhall lost $138,573 in 1986 and $487,215 in 1987 when Hatfield and Staha were paid a total of $513,768 in 1986 and $497,754 in 1987 under their employment contracts.

Managing directors have a fiduciary duty to the

corporation not to pay themselves excessive salaries. *Clark-McWilliams Coal Co.* v. *Ward*, 185 Ark. 237, 47 S.W.2d 18 (1932). A director is a "fiduciary" as to any agreements between the corporation and himself *individually*. The directors have the burden of proving the good faith of the transaction and its "inherent fairness" to the corporation. *Pepper* v. *Litton*, 308 U.S. 295 (1939).

Hatfield and Staha had the burden of proving at trial both the "good faith" and "inherent fairness" of the transaction of monies they received after the expiration of the last approved contract on October 1, 1987. The trial court erred in this regard, and the case is remanded for the court to take additional evidence on the question of whether the compensation to MED-MAX for the management services of Hatfield and Staha was in "good faith" and "inherently fair" to Dunhall after October 1, 1987. Its fairness to *all* shareholders must be determined. Our holding later in this opinion that MED-MAX was an illegal voting trust will necessarily be considered by the chancellor in this matter on remand.

■ Hatfield and Staha formed MED-MAX to which the employment contracts of Hatfield and Staha, through their corporations, were assigned. The owners of 50.5 percent of Dunhall stock were limited partners in MED-MAX. Hatfield and Staha did not breach their fiduciary duty to Dunhall by forming MED-MAX. Damages from any *activity* (as opposed to formation) could be the basis for damages; i.e., excess compensation. However, we find no error in the chancellor's finding that the formation of MED-MAX by Hatfield and Staha was not a breach of fiduciary duty to Dunhall.

■ The chancellor erroneously found that the "double billing" procedure established and operated by Staha (unknown to other directors or shareholders) was not a breach of fiduciary duty due to his broad discretion over corporate activities and the requirement that the court speculate as to damages.

The evidence clearly demonstrates that this procedure is a breach of Staha's fiduciary duty to Dunhall. Within the applicable statute of limitations, actions for refund of overpaid amounts and various other actions could drastically affect Dunhall's financial condition much to the detriment of its shareholders. The

evidence reflects that this "double billing" placed the corporation in jeopardy of liabilities which are unclear from the record. Futhermore, the evidence is unclear as to whether the compensation of Hatfield and Staha per the contracts was enhanced by this procedure.

The case is remanded for the chancellor to determine the damages to Dunhall as a result of Staha's "double billing" operation, including whether he and Hatfield were compensated from such funds which would be a clear violation of his fiduciary duty.

Hatfield and Staha formed MED-MAX as a vehicle to gain control of Dunhall by acquiring more than 50 percent of its stock. Ark. Code Ann. § 4-26-706(a)(b) (1987) provides:

> Any number of shareholders of a corporation may create a voting trust for the purpose of conferring upon a trustee or trustees the right to vote or otherwise represent their shares, for a period of not to exceed ten (10) years, by entering into a written voting trust agreement specifying the terms and conditions of the voting trust, by depositing a counterpart of the agreement with the corporation at its registered office, and by transferring their shares to the trustee or trustees for the purposes of the agreement.

> The counterpart of the voting trust agreement so deposited with the corporation shall be subject to the same right of examination by a shareholder of the corporation, in person or by agent or attorney, as are the books and records of the corporation and shall be subject to examination by any holder of a beneficial interest in the voting trust, either in person or by agent or attorney, at any reasonable time for any proper purpose.

The chancellor properly found that the legislative purpose of this section is to "avoid secret control and unlawful purpose," but that the Code did not apply to the facts of this case. As of September 21, 1987, the first shareholders' meeting after formation of MED-MAX on July 8, 1987, the names of the limited partners of MED-MAX, who were also Dunhall's shareholders, were not of public record. The vote by Staha of Dunhall shares owned by MED-MAX at the September 21, 1987, shareholders'

meeting was unauthorized.

■ The main purpose of a voting trust statute is to avoid secret, uncontrolled, combinations of stockholders formed to acquire voting control of a corporation to the possible detriment of the nonparticipating stockholders. *Oceanic Exploration Co.* v. *Grynberg*, 428 A.2d 1 (Del. 1981). Even though MED-MAX is a partnership, its characteristics come within the definition of a "voting trust" in Ark. Code Ann. § 4-26-706. Section 10.1(b) of the MED-MAX agreement provides:

> The general partners (MJS, Inc. and RNI, Inc.) are hereby granted the right, power and authority to do on behalf of the partnership all things which, in their sole judgment, are necessary, proper or desirable to carry out the aforementioned duties and responsibilities, including, . . . the right, power and authority to vote the [Dunhall] shares in such a matter as they deem appropriate in their sole discretion. . . ."

■ The MED-MAX partnership violates Ark. Code Ann. § 4-26-706(a)(b) in that the term is longer than ten years, and a copy of the fully executed written agreement, including names of the limited partners, was not filed with Dunhall. We hold that MED-MAX as formed at the times involved in the trial, was an illegal voting trust. Therefore, Staha's vote on behalf of shares owned by MED-MAX at the Dunhall shareholders' meeting on September 21, 1987, and any subsequent meetings was unauthorized. The general partners of the illegal voting trust will not be permitted to vote the shares in subsequent shareholders' meetings. The chancellor correctly determined that directors should be elected according to the articles of incorporation and by-laws of Dunhall.

■ Dunhall contends in its cross-appeal the chancellor erred in requiring it to pay $25,000 in fees to Hall's attorneys. The award of attorney's fees is clearly within the guidelines of *Millsap* v. *Lane*, 288 Ark. 439, 706 S.W.2d 378 (1986). The shareholders, who prosecuted this derivative action which resulted in economic recovery to Dunhall, proved breaches of fiduciary duty, and the basis for the court's award is clearly supported by the record.

The case is remanded for proceedings not inconsistent with

this opinion.

Affirmed in part; reversed and remanded in part.

GLAZE, J., not participating.