Billy V. HALL, Albert P. Dunagin, John R. Meade, and Hall Enterprises, Inc., an Arkansas Corporation v. Monte J. STAHA; Jimmy H. Hatfield; Med-Max Associates Limited Partnership; MJS, Inc.; RNI, Inc.; and Dunhall Pharmaceuticals, Inc, an Arkansas Corporation

92-338 858 S.W.2d 672

Supreme Court of Arkansas
Opinion delivered July 12, 1993
[Supplemental Opinion on Denial of Rehearing
September 27, 1993.*]

*Corbin & Brown, JJ., not participating.

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *John E. Pruniski* and *Dorcy Kyle Corbin*, for appellant.

*Stephen E. Adams, Ltd.*, and *Estes, Estes & Gramling*, by: *Peter G. Estes, Jr.*, for appellee.

JAMES R. VAN DOVER, Special Justice. This is the second appeal of two consolidated actions of which a shareholders derivative action, filed by appellants under Rule 23.1, ARCP, remains.

Appellants, led by Dr. Billy Hall, are minority shareholders of Dunhall Pharmaceuticals, Inc. ("Dunhall"), a privately traded Arkansas corporation. Dr. Hall is one of Dunhall's organizers and the only member of its three man board of directors not involved in its daily management. The appellees/cross-appellants are Dunhall; Monte J. Staha and Jimmy Hatfield, Dunhall's President and Sales Manager, respectively; MJS, Inc. and RNI, Inc., corporations they own; and Med-Max Associates Limited Partnership (Med-Max), which they control. Staha and Hatfield are the other board members.

Through MED-MAX, Staha and Hatfield gained control of 50.5% of Dunhall's stock during the summer of 1987. Control was acquired while they were aware that Jones Medical Industries, Inc. ("JMI") was interested in acquiring "all or substantially all" of Dunhall's capital stock and that a JMI acquisition would jeopardize the continuation of their executive positions and compensation. The Chancellor found their compensation to be

excessive.

A sufficient history of this case appears in the first opinion. It will not be repeated here, except where required. See *Hall* v. *Staha* v. *Dunhall Pharmaceuticals, Inc.*, 303 Ark. 673, 800 S.W.2d 396 (1990). In that earlier opinion, three issues were remanded for further development and decisions. The Chancellor conducted a second hearing in June 1991. His three decisions, together with orders incidental to them, are now here.

### I. WAS STAHA AND HATFIELD'S CONDUCT, CONCERNING JMI'S OFFER OF JULY 13, 1987, TO PURCHASE "ALL OR SUBSTANTIALLY ALL" OF DUNHALL'S STOCK IN THE BEST INTEREST OF DUNHALL AND IF NOT, TO WHAT EXTENT WERE ·APPELLANTS DAMAGED?

Appellants sought judgment against appellees for profits lost from being deprived of an opportunity to sell their shares to JMI, pursuant to JMI's "offer" of July 13, 1987. They attribute that loss to Staha and Hatfield's failure to actively pursue or become informed about JMI's proposal and to undertake board action concerning it. Protecting their employment contracts was Staha and Hatfield's alleged motive. The Chancellor denied the judgment after determining that Staha and Hatfield acted in Dunhall's best interest regarding the purchase proposal; that no evidence of JMI's continuing interest had occurred through December 1989; and that appellants failed to prove that Staha and Hatfield's conduct caused any damages. The Chancellor also found that "the actions of Staha and Hatfield in their continuation to purchase stock through MED-MAX was not, *in and by itself*, inherently in bad faith to the interest of the corporation or the shareholders and not in conflict with Staha's efforts to communicate with [JMI's executive officer]." (Emphasis added.)

JMI conditioned their proposal upon its own representatives obtaining basic information from Dunhall's financial and business records. That work having not been done, the conditions were not satisfied. The July 13 proposal lacked the formalities of an "offer" to any shareholder and appellants cannot successfully say they suffered deprivation. We therefore affirm the Chancellor's dismissal of Count IV.

■ Our acceptance of the Chancellor's ultimate ruling is not an approval of the activities—imputed to Staha and Hatfield—that preceded and followed receipt of the July 13, 1987 letter. The Chancellor's decision that Staha and Hatfield sustained their heavy burden of proving their conduct was inherently fair and a service to the best interests of Dunhall and all its shareholders is clearly erroneous.

Although both Staha and Hatfield had acquired a substantial number of shares prior to April 1987, having absolute control of Dunhall was not essential. However, their attitudes changed and the need to secure that control became imperative when JMI expressed an interest in purchasing the effective control of Dunhall in April 1987,[1] and it was made known that neither they nor their positions would be retained under JMI ownership. In the face of Hall's competing efforts, Staha and Hatfield retained New York counsel, and organized MED-MAX under Delaware law, serving as its general partners. They then personally funded a trust account from which Dunhall's sales staff drew purchase money funds for Dunhall stock. The salesmen traded their shares to MED-MAX to become its limited partners. Immediately after MED-MAX had 50.5% of the shares, Hatfield and Staha directed that no additional shares be purchased, convened a special shareholders meeting and restored their domination of the board by reducing it from seven to three members. Without securing outside review or seeking to determine comparable salaries being paid in the pharmaceutical industry, the salaries were continued at 4% of net sales after September 30, in spite of the minority's protests of excessive compensation.

JMI's letter of July 13, 1987, arrived in the midst of these efforts to gain control of Dunhall. It followed by only six weeks, JMI's withdrawal of the April 1987 overture.[2] After July 13, Staha made several phone calls in an effort to communicate with JMI. On August 31, 1987, after he had control, he addressed a certified letter to JMI's chief executive. It documented Staha's

---

[1] On April 13, 1987, JMI made a non-binding offer to purchase 48% of Dunhall then owned by Staha, Hatfield and Hall collectively.

[2] Whether this withdrawal letter was voluntary or written at Staha's request is disputed. The Chancellor made no finding on this issue. Holding it to be voluntary is inconsistent with JMI's July 13, 1987, letter of renewed or continuing interest.

lack of concern.[3] Staha and Hatfield attempted to excuse their failure to take affirmative action by pointing to JMI's failure to begin the "satisfactory review and inspection of the book and records and the due diligence examination by JMI's accountants and lawyers." Staha also complained that JMI's chief executive officer was unavailable during the intervening six week period of July 13 — August 31.

Attributing increased corporate profits to the preservation of the Staha and Hatfield management team and equating those profits as serving Dunhall's best interest, the Chancellor failed to recognize the distinction between the community of shareholders and Dunhall, the corporate entity. Because an acquisition by JMI presented personal adversity to Staha and Hatfield, we cannot naively accept profit, a *corporate* achievement, as being necessarily beneficial to the shareholders. Corporate profits become beneficial to a shareholder only when they are distributed as dividends or cause appreciation in market value. Neither occurred here.

Deciding the proper reaction to a buy-out or takeover is not a decision routinely made in the normal course of every day business. Its impact on shareholders deserves evaluation. Such an opportunity involves the corporation/shareholder relationship to a greater degree. Here, no ready market for Dunhall stock existed. A shareholder, especially one in disfavor with management, was unable to transfer his risk capital to another investment. Staha and Hatfield owed all shareholders an affirmative duty to investigate thoroughly any buy-out opportunity that was made in apparent good faith, to seek an independent appraisal of its consequences, and to refrain from any conduct designed or allowed to thwart it.

We do not separate the activities of MED-MAX from Staha and Hatfield.[4] Staha and Hatfield were responsible for its formation and enjoyed the fruits of control that it provided.

---

[3] He wrote of unsuccessful efforts "on several occasions . . . to make contact . . . concerning [your] interest in Dunhall" and requested a current statement of JMI's interest.

[4] Earlier we distinguished the *formation* of MED-MAX from the *activities* of MED-MAX. *Hall·v. Staha*, 303 Ark. at 681, 800 S.W.2d at 401.

MED-MAX was their alter ego. Its activities are imputed to Staha and Hatfield. MED-MAX's acknowledged purpose was to gain and exercise control over Dunhall and to assure that it was operated as it had been in the past. It was designed to frustrate appellants' efforts to achieve change and perpetuate management, and it did so. A MED-MAX accomplishment was a Staha/Hatfield accomplishment. When resisting takeover attempts and dealing with other shareholders, the directors' sole or primary motivation cannot be to entrench themselves in office. *Unocal Corp.* v. *Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985). The facade of MED-MAX will not be allowed to shield Staha and Hatfield's genuine motives.

In the search for inherent fairness and good faith to a corporation and shareholders, conduct of directors must be subjected to "rigorous scrutiny" when conflicting self-interest is shown.[5] *Pepper* v. *Litton*, 308 U.S. 295, 60 S. Ct. 238, 84 L. Ed. 281 (1939). As officers *and* directors, Staha and Hatfield are held to an even higher than the normal and demanding standards that apply to a fiduciary. *Raines* v. *Toney*, 228 Ark. 1170 at 1178, 313 S.W.2d 802 (1958). Applying these stricter standards, we draw a conclusion that is clearly contrary to the Chancellor's.

II. WAS STAHA AND HATFIELD'S COMPEN-
SATION AFTER OCTOBER 1, 1987, INHER-
ENTLY FAIR TO ALL SHAREHOLDERS AND
FIXED IN GOOD FAITH, AND, IF NOT, DETER-
MINE THE EXTENT OF EXCESSIVENESS.

Throughout their employment with Dunhall, Staha and Hatfield's annual compensation was fixed with reference to annual net sales. Since October 1982, that level was 4%, with the contract being renewed annually until the board and the officers failed to agree. No insurance, pension plans or stock options were added. At the May 1987 shareholders' meeting, Hall made known his resistance to continuing that arrangement. Once in control, Staha and Hatfield continued their pay at 4% of net

---

[5] The definition of inherent is "firmly or permanently contained, in-dwelling or intrinsic." *Compton* v. *Talley*, 227 Ark. 491 at 494, 299 S.W.2d 653 (1957); "involved in the constitution or essential character." Webster's New International Dictionary (2d Ed. 1957).

annual sales. Each one received $248,887 in 1987, $267,841 in 1988, $500,685 in 1989 and $387,450 in 1990.

After hearing the testimony of two compensation experts, the Chancellor held that the compensation was inherently unfair and excessive and set reasonable compensation in 1987 at $230,000 each ($150,000 salary plus $80,000 as compensation for the lack of retirement, health, disability and life insurance plans). Automatic 6% annual increases were ordered. Dunhall was granted judgment for $769,072, against Staha and Hatfield, jointly and severally, plus post-judgment interest from the date of the second hearing.

Appellants complain that the judgment was inadequate. In a cross-appeal, appellees argue that their 4% compensation should be continued, if not increased.

Each expert carefully chose supporting data to justify his client's position. Both attempted to quantify the compensation required to persuade other similarly qualified executives to accept Dunhall's top two management positions.

Because salaries were Staha and Hatfield's only remuneration, appellants' expert looked for comparable compensation being paid the top two executives by companies that had annual sales under $30 million. (Dunhall's were less than one-third of the amount.) His view of the required salary began at $93,000 in 1987 and extended to $139,000 in 1990. He fixed the average cost of supplementary fringe packages at 25%-30% of the salaries, while appellees' expert fixed it at 25%-35%.

The data chosen by appellees' expert was retrieved from information filed with the Securities and Exchange Commission by twenty-two publicly traded pharmaceutical companies. All had annual sales of less than $100 million, and all but two had stock option plans in effect. His total package was broken into the four categories of cash salary, annual merit bonuses, and health/ other insurance and retirement security plans, plus stock options, the latter intended to encourage management to increase shareholder values. Because Dunhall was not publicly traded, he calculated profits realized by executives as they sold stock acquired under stock option plans and included the annualized result as a part of his compensation he thought was required.

Substantial portions—72% of chief executive officer's cash compensation and 57% of the second officer's—of his total were profits earned in this manner. Removing these profits from his final figures, the average annual direct pay (salary plus merit bonuses) totals were $146,440 (28% of $523,000) for the twenty-two CEOs and $110,460 (42% of $263,000) for the second officer. Apparently, the Chancellor chose to disregard his view that cash was a logical substitute for stock option profits, as his award consisted of salaries and fringe benefit supplements only. He left consideration of stock option plans to the future and assigned it to the Compensation Committee discussed in Point IV. That delegation being determined to be proper, our review is of the Chancellor's award of direct pay and fringe benefits.

The Chancellor erred when he fixed the cost of the fringe benefit package at $80,000, or 53% of $150,000. That finding is not supported by the evidence. Neither expert fixed it at greater than 35% of salary, the middle point being 30%.

Neither is there any evidence that supports the Chancellor's finding that 1987 direct pay should be $150,000, or that successive salaries should be increased annually at a fixed rate. In the survey conducted by appellees' expert, the average direct pay for CEOs was $113,000 in 1987, $134,000 in 1988, $174,000 in 1989 and $173,000 in 1990. For the second officer, it was $89,000 in 1987, $101,000 in 1988, $120,000 in 1989 and $144,000 in 1990. Appellants' suggested averages were $93,000 in 1987, $106,000 in 1988, $111,000 in 1989, and $139,000 in 1990 for each officer.[6]

While the record does not support the Chancellor's findings, it is sufficient to allow us to make findings on which the Chancellor can base an amended judgment. If Staha and Hatfield had called upon the expert they used at trial in 1987, we assume he would have provided them with the same information that he relayed to the Chancellor. Without showing why larger than industry averages should have been paid them, which was not given on record, Staha and Hatfield are entitled to no more than

---

[6] The average salary paid by Natural Resources, a company without a stock option plan but with comparable total sales and more rapid sales growth, to their top two officers was $61,750 in 1988, $69,400 in 1989 and $157,191 in 1990.

the annual averages assigned by their expert to their respective positions.[7] Staha is entitled to base salaries of $113,000 in 1987, $134,000 in 1988, $174,000 in 1989 and $173,000 in 1990, plus 30% thereof for the absent insurance and retirement supplements. Hatfield is entitled to be paid $89,000 in 1987, $101,000 in 1988, $120,000 in 1989 and $144,000 in 1990, plus the same 30% supplement.[8]

The Chancellor did not explain why the judgment was imposed on Staha and Hatfield, jointly and severally, when one served as the superior to the other and was presumably entitled to receive greater remuneration for his services. In each set of executive salaries surveyed, appellees' expert reported a disparity between the highest paid executive and his immediate subordinate. A liability of one for excessive compensation is not imputed to the other. Their liabilities must be distinguished. One judgement should be entered against Hatfield, RNI, Inc. and MED-MAX and another judgment should be against Staha, MJS, Inc. and MED-MAX. Only MED-MAX has joint and several liability. The amended difference between the amounts of the separate judgments is the extent that the salary paid to one contrasts with the salary paid to the other.[9]

The Chancellor is ordered to enter revised judgments consistent with these conclusions and to award post-judgment interest on the increase from the date of the Mandate.

### III. SHOULD THE JUDGMENT FOR EXCESSIVE COMPENSATION BE AWARDED TO DUNHALL OR TO APPELLANTS PRO-RATA?

The whole of the Chancellor's excessive compensation judgment was awarded to Dunhall. Appellants argue that a pro-rata portion should have been given to them.

---

[7] That Staha permitted the "double billing" practice (see Point V.) to exist detracts from him having any special qualifications.

[8] By adopting the industry annual averages for Staha and Hatfield, we have not meant to imply that such future amounts are necessarily "reasonable."

[9] We approve the methodology adopted by the Chancellor as set out in paragraph 37 of the Amended and Substituted Order and Judgment. Staha and Hatfield received excessive compensation of $556,172.75 and $714,772.75 respectively during the October 1, 1987—December 31, 1990, period.

This action is not to correct improprieties allowed by a board of directors consisting of independent persons. The absolute control acquired and continued by Staha and Hatfield cannot be ignored. The Dunhall board and its treasury cannot be separated from the will of its management. The board remains insensitive to its responsibilities to all shareholders. While shareholder equity has increased over the course of this litigation, no dividend has been declared and no legitimate corporate reason for retaining the profits was shown. Appellees continue to regard Dunhall as a personally owned company and are operating it for their exclusive gain. A special rule, applicable when a board lacks sufficient independence from management, is proper. That rule diverts to appellants a pro-rata portion of the excessive compensation judgments against Staha and Hatfield.

In *Lynch v. Patterson*, 701 P.2d 1126 (Wyo. 1985), the court borrowed language from *Backus v. Finkelstein*, 23 F.2d 357 (D. Minn. 1927) and said:

> "*** For obvious reasons, it may be highly improper to direct that the moneys here recovered on behalf of the corporation shall be paid into the treasury thereof. That might be paying the moneys back into the custody and control of those from whom the recovery was had. It might defeat eventually the purpose of the suit and be the beginning of another prolonged cycle of litigation. Unless conditions shall ensue which will materially change the situation, the distribution, so far as possible, should be directly to the individuals who will ultimately be entitled thereto."

***

Corporate recovery would simply return the funds to the control of the wrongdoers. The three defendant directors in this case constitute the policy-making body of the corporation. They manage the business and affairs of the corporation under statutory authority. Furthermore, two of the directors hold 70 percent of the voting stock in the corporation. Given the family orientation and the small number of shareholders of LCS, any change in control of the corporation is unlikely.

701 P.2d at 1130.

The judgment should be modified accordingly. The minority should receive 49.5%, if that is its actual pro-rata share, and the balance should be entered for Dunhall.

### IV. DID THE CHANCELLOR ERR WHEN HE FIXED A $25,000 FEE FOR APPELLANTS' ATTORNEYS OR ORDERING STAHA AND HATFIELD TO PAY IT?

We have previously held that a fee award in this case falls within the guidelines of *Millsap v. Lane*, 288 Ark. 439, 706 S.W.2d 378 (1986). *Hall v. Staha*, 303 Ark. at 683, 396 S.W.2d at 402. The Chancellor was required to set reasonable compensation for efforts expended by appellants' attorneys subsequent to the period considered when the $30,000 fee was made following the first hearing. Through June 30, 1991, appellants' total fees and expenses were $235,467.26, against which the first fee was credited. The residual claim was $204,953.56. On the other hand, the billing and expenses of law firms representing the appellees totaled $137,050.32. The Chancellor granted appellants' attorneys a supplementary fee of $25,000 and entered judgment for that amount against *all* appellees. On appeal, appellants insist they are entitled to the entire claim of $204,953.56. Appellees contend that Dunhall should be the only judgment debtor.

We find no suggestion that the Chancellor made a deliberate determination of reasonable compensation. Unless the affidavits of appellees' attorneys were construed to contradict appellants', no counter-affidavit was filed. Certainly, no hearing was conducted.

■ While we recognize the Chancellor observed the attorneys' trial work, he was not adequately apprised about the time requirements or details of the preparation that preceded either trial. Therefore, we remand this matter so the chancellor can set a proper fee for the work performed by appellants. In remanding this cause for determination of reasonable attorney's fees, we direct the chancellor to the guidelines in *Millsap*.

■ In *Millsap*, the prevailing attorneys' $422,977 fee request was granted after a hearing where the prevailing attorneys produced their time records, revealed their hourly rates,

presented their actual expenses and offered expert testimony to substantiate the reasonableness of their claim. The criteria used to establish reasonableness appear there and should be equally applicable here.

 Appellees are correct in their argument on this point. The pool of the "common fund" serves as the source of the payments of fees and expenses. But to order the fund to pay this charge before its division between Dunhall and the appellants would reward those whose conduct required the filing of this action and detract from our intent to discourage director abuse of their fiduciary responsibilities. When determined, the entire amount should be paid by Dunhall and not any other appellee.

## V. SHOULD A TOTALLY INDEPENDENT COMPENSATION COMMITTEE BE FORMED TO SET FUTURE EXECUTIVE COMPENSATION PLANS? IF SO, SHOULD THE COURT RETAIN JURISDICTION AND REVIEW ITS OUTPUT?

The court created a three person compensation committee and directed appellees to appoint one member and appellants to appoint the other. The third would be named by the first two. Its membership would exclude all parties, all minority shareholders and any others having either a direct or indirect interest in Dunhall. Its purpose is to establish future compensation plans for management, giving due weight to the performance and responsibilities of the highest paid corporate officers. Consideration of a stock option plan is also a part of its job. All decisions are binding on Dunhall, and Staha and Hatfield are enjoined from voting against them.

Appellants contend that minority shareholders should be allowed to serve on the committee. Appellees' cross-appeal maintains that the Chancellor must reserve jurisdiction to review Committee findings rather than making them absolute. They argue that the Chancellor's excessive compensation ruling should have allowed the "cash for stock option profit" substitution, thereby eliminating the need for the Committee to consider stock option plans in the future.

 The business judgment rule is a statement of judicial reticence. It flows from the thought that judges are not equipped

as well as directors to make business decision. But judges have the duty to correct wrongs, and Chancellors have a special authority to craft remedies to overcome board omissions and to create an environment where fairness can be demonstrated. The directors had ample opportunity to integrate independent directors into their board and failed to do so. Until Dunhall is operated under an umbrella of fairness to all, existing management and the existing board must surrender their authority to set executive compensation.

Setting those salaries is not among the Chancellor's expected duties. We will not enlarge his responsibilities or require him to supervise such matters that he has elected not to do. Directing the formation of the Committee is a proper solution, and retaining the qualifications of its members will foster fairness. There is no valid reason to include persons that have obvious conflicts of interest. The parties should devote their attention to selecting honorable, diligent individuals who have the requisite business acumen and who will take their responsibilities seriously and not submit to improper influences from any source.

Stock options became important to Staha and Hatfield with the onset of litigation and the realization that appellants strongly opposed the continuation of the compensation arrangements. Shares made available to them now through such a plan would have little, if any, value. Current management is firmly in place and a stock option plan is not necessary to attract their replacements. The Chancellor is not required to indulge appellees' every request or to speculate on Dunhall's future needs.

All portions of the Chancellor's order relating to this point are affirmed.

### VI. DID DUNHALL SUSTAIN DAMAGES OR DID STAHA AND HATFIELD PROFIT FROM THE "DOUBLE BILLING" PRACTICE? IF SO, FIX THE AMOUNT THEREOF.

The final remand question required the Chancellor to determine the damages to Dunhall from a practice known here as "double billing." Appellants concede that neither Staha or Hatfield personally benefited from these moneys. They agree

that no customer filed a suit to recover the collected funds. The Chancellor correctly determined that the appellants failed to carry their burden of proof. We affirm.

VII. SHOULD THE CHANCELLOR'S ORDER HAVE ENJOINED DUNHALL FROM DISCHARGING STAHA OR HATFIELD OR OTHER EMPLOYEES WITHOUT PRIOR CONSENT OF THE CURRENT MANAGING OFFICERS, EXCEPT FOR GOOD CAUSE.

██ Another paragraph of the order prevented Dunhall from discharging Staha, Hatfield or any other employee without consent of the managing officer except for good cause. Both sides agree that this relief was never requested and is not supported by current Arkansas law. That part of the order is reversed and shall be deleted.

CORBIN and BROWN, JJ., not participating. Special Associate Justice DAVID M. GLOVER joins this opinion.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
SEPTEMBER 27, 1993

*John E. Pruniski III*, for appellants.

*Peter G. Ester, Jr., Stephen E. Adams*, and *Roy E. Stanley*, for appellees.

██ PER CURIAM. In their petition for rehearing, appellants contend that they requested this court to set Staha's and Hatfield's salaries for the years 1987-1991, but the court failed to

determine these men's compensation for 1991. Having used testimony and evidence of the appellees' expert witness to set such salaries, we point out that the year 1991 was not mentioned. As a consequence, any setting of Staha's and Hatfield's salaries would have to be addressed by the parties and the trial court on remand. Appellants' and appellees' petitions for rehearing are otherwise denied.

CORBIN and BROWN, JJ., not participating.