ST. LOUIS SOUTHWESTERN RAILWAY COMPANY *v.* Billy John GRIDER and ASPLUNDH RAILROAD DIVISION *v.* OAKLEY TRUCKING, INC., and BRUCE OAKLEY, INC.

94-947                                                    900 S.W.2d 530

Supreme Court of Arkansas
Opinion delivered June 19, 1995

86

*Barrett & Deacon*, by: *Barry Deacon*, and *D.P. Marshall, Jr.*, for appellant St. Louis Southwestern Railway Company.

*Sloan Rubens & Peeples*, by: *Kent J. Rubens*, and *Hubbell, Sawyer, Peak & O'Neal*, by: *Gene Napier* and *Chris Leach*, for appellee Billy John Grider.

*Frye, Mickel & Boyce, P.A.*, by: *Brian P. Boyce*, for appellee Asplundh Railroad Division.

*Barber, McCaskill, Amsler, Jones & Hale, P.A.*, by: *Michael L. Alexander*, for cross-appellants Oakley Trucking, Inc., and Bruce Oakley, Inc.

JACK HOLT, JR., Chief Justice. This case involves a collision between a freight train and a tractor-trailer, which occurred at a rural crossing in Crittenden County on August 1, 1990. The conductor of the train, appellee Billy John Grider, suffered a neck injury and brought suit against his employer, appellant St. Louis Southwestern Railway Company ("Railway"), under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, asserting that Railway was negligent in failing to keep a right-of-way free from weeds and other obstructing vegetation, thus not providing him with a reasonably safe place to work. Railway filed a third-party complaint against Oakley Trucking, Inc., and Bruce Oakley, Inc. ("Oakley Trucking"), the owner of the truck, alleging that the truck driver, Doyle Montgomery, was negligent in operating the truck and for not stopping and yielding to the train. Mr. Grider amended his complaint to sue Oakley Trucking, which in turn filed a cross-claim against Railway and a third-party com-

plaint against Asplundh Railroad Division ("Asplundh"), which had a contract with Railway to control the vegetation by spraying chemicals at this and other rights-of-way. Railway filed a cross-claim against Asplundh for contribution. The jury returned a verdict in favor of Mr. Grider, apportioning damages between Railway and Oakley Trucking. Pursuant to a stipulation as to property damage between Railway and Oakley Trucking and based upon the apportionment of fault as set by the jury, the trial court entered judgment in favor of Oakley Trucking on its cross claim against Railway for 75 percent of the damage to its trailer.

At trial, the jury heard testimony from several witnesses that weeds at the intersection reached heights of up to fifteen feet in contravention of Ark. Code Ann. § 23-12-201 (1993), which mandates that railroad corporations must maintain their rights-of-way free of obstructions. Edward Evans, the manager of Asplundh, testified that, pursuant to a contract between his company and Railway, Asplundh sprayed the crossing approximately two-and-one-half months prior to the accident, but that follow-up sprays were done only if they were notified by Railway that there was a problem. Railway employees admitted that they did not notify Asplundh that a respray was needed. The jury also heard testimony from Mr. Montgomery regarding his actions immediately prior to the accident, and from Mr. Grider, his physicians, and an economist regarding the extent of his injuries and economic losses as a result of the accident.

Over Railway's objection, the trial court instructed the jury on FELA rule-of-liability and on FELA assumption-of-risk. Following the trial court's denial of Oakley Trucking's motion for directed verdict, the jury returned a verdict evaluating Mr. Grider's damages at $1,750,000, apportioning 75 percent fault to Railway, and 25 percent to Oakley Trucking. Pursuant to a stipulation of property damage, the trial court entered judgment in favor of Oakley Trucking against Railway in the amount of $12,750. The trial dismissed with prejudice both Oakley's third-party complaint against Asplundh, and Railway's cross-claim against Asplundh for contribution. The trial court denied Railway's motion for new trial based on excessive damages and alleged errors in instructing the jury, which, together with Oakley Trucking's assertion that the trial court erred in refusing to direct a verdict in its favor, form the basis for the present appeal and cross-appeal. As

neither Railway's arguments relating to the jury instructions nor Oakley Trucking's argument relating to the sufficiency of the evidence has merit, we affirm the findings of the trial court.

## I. Rule-of-liability instruction

For its first allegation of error on appeal, Railway asserts that jury instruction 19, AMI Civ. 3d 1901, regarding FELA rule-of-liability, confused the jury and bound them to find Railway ultimately liable for Mr. Grider's injuries. The trial court instructed the jury as follows:

> At the time of this occurrence there was in force a federal statute which provided that whenever an employee for a railroad is injured while engaged in the course of his employment and the injury results in whole or in part from the negligence of any of the officers, agents or other employees of the railroad or by reason of any defect or insufficiency, due to the railroad's negligence, in its works, then the railroad shall be liable in damages to the injured employee.

We have outlined the procedure for making objections to jury instructions as follows:

> The procedure for preserving a point of appeal concerning instructions is not complex. A.R.C.P. Rule 51 mandates that in order to preserve an objection regarding an erroneous instruction of the law, the party appealing must make a timely objection by telling the trial judge why the instruction was wrong. When the point of appeal is that the court failed to give an instruction, the party appealing must submit a proposed instruction on the issue.

*Peoples Bank & Trust Co.* v. *Wallace*, 290 Ark. 589, 721 S.W.2d 659 (1986). (Citations omitted.) *See also Precision Steel Warehouse, Inc.* v. *Anderson-Martin Mach. Co.*, 313 Ark. 258, 854 S.W.2d 321 (1993). We have stated that no instruction is required to be proffered in substitution for the instruction to which objection is made; rather, all that is required to preserve an objection for appeal regarding an erroneous instruction of law is to make a timely objection and to state a valid reason for the objection. A.R.C.P. Rule 51; *Thomas Auto Co.* v. *Craft*, 297 Ark. 492, 763 S.W.2d 651 (1989); *Tandy Corp.* v. *Bone*, 283 Ark. 399, 678

S.W.2d 312 (1984). As Railway made a timely objection to jury instruction 19, stating that it was both confusing and binding in the sense that it told the jury "to find the railroad company completely liable, if it is negligent in any degree, with no consideration of the other defendants," it preserved its argument for our review.

Railway concedes that the joinder of Mr. Grider's FELA action with his common law actions was not error. *Arkansas Kraft Corp.* v. *Johnson*, 257 Ark. 629, 519 S.W.2d 74 (1975); *See also* Comment to AMI Civ. 3d 1921. Although it acknowledges that jury instruction number 19 is an approved instruction, Railway contends that it was error for the trial court to give the instruction in the context of this case due to the fact that it was also alleged that Oakley Trucking's and Asplundh's negligence proximately caused the accident.

While Railway asserts that jury instruction number 19 should not have been given in the "context" of this case, we cannot say that this "context" is so unique in light of the Comment to AMI Civ. 3d 1921, which states that the correct procedure in cases involving both FELA claims and common law claims is that the case be submitted on interrogatories. This case was so presented, and the jury decided the issues of Railway's, Oakley Trucking's and Asplundh's negligence in separate interrogatories. Thereafter, in response to Interrogatory No. 4, the jury apportioned damages as follows: 75 percent to Railway, 25 percent to Oakley Trucking, and zero percent to Asplundh.

In light of these apportionments, Railway's argument that jury instruction number 19 bound the jury to find it ultimately liable for Mr. Grider's injuries is not well taken. Similarly, we focused on the jury's apportionment of damages in rejecting a claim that the trial court erred in refusing to allow counsel to argue the effects of contribution among joint tortfeasors in *Rathbun* v. *Ward*, 315 Ark. 264, 866 S.W.2d 403 (1993). In that case, we held that, even if the trial court had erred in precluding counsel's argument on the issue of contribution, such error was rendered harmless by the jury's apportionment of fault — 75 percent fault to one tortfeasor and 25 percent to another tortfeasor.

Railway's reliance on our decision in *Phillips Coop. Gin Co.* v. *Toll*, 228 Ark. 891, 335 S.W.2d 303 (1958), in support of

its argument that jury instruction number 19 was a binding instruction is misplaced, as the issues in *Toll* do not correspond with the issues before us. *Toll* involved the question of whether a tortfeasor was an employee or an independent contractor, in which the jury was given an instruction regarding this issue. We held that, because the jury was told in the instruction to consider only two conditions, that is, (1) in whose business the tortfeasor was engaged, and (2) who had the right to control and direct his conduct, the instruction was an improper binding instruction because it omitted other conditions which should not have been ruled out in the case, including the employer's right to terminate the employment.

Here, we are concerned with whether jury instruction number 19 bound the jury to find Railway ultimately liable for Mr. Grider's injuries. Railway's argument in this regard fails for several reasons. Its assertion that Oakley Trucking's negligence and Asplundh's negligence are essential conditions wrongly assumes that the negligence of these parties is foundational to the determination of Railway's negligence. As Mr. Grider correctly states in his brief, the jury need not find Oakley Trucking or Asplundh negligent to find Railway negligent, and, conversely, negligence on the part of Oakley Trucking or Asplundh cannot exonerate Railway of its negligence. *See Louisiana-Nevada Transit Co.* v. *Ozan Lumber Co.*, 235 Ark. 356, 360 S.W.2d 120 (1962), *Arkansas Kraft Corp.* v. *Johnson*, 257 Ark. 629, 519 S.W.2d 74 (1975), *Bill C. Harris Constr. Co. Inc.* v. *Powers*, 262 Ark. 96, 554 S.W.2d 332 (1977).

In addition, the jury was instructed regarding Railway's duties and the elements that had to be proved in order to find Railway liable, including: (1) that Railway had a duty to provide Mr. Grider with a reasonably safe place to work; (2) that the failure to use ordinary care on the part of Railway was negligence; (3) that Railway had a statutory duty to keep crossing areas free of visual obstructions, and that violation of that statutory duty was evidence of negligence. The jury was also instructed as to the duties of Oakley Trucking and Asplundh, and on the elements required to be proved in order to find them responsible for the accident. An instruction on concurrent proximate causation was also given. And finally, the jury was told that each defendant was entitled to its own defense, which was not to be

adversely affected by the jury's findings to other defendants, and that each defendant's case was to be decided separately as if each was a separate lawsuit. In short, the jury was fully apprised of the law relating to the case. We have repeatedly stated that jury instructions should not be reviewed in isolation, but rather considered as a whole in determining whether the applicable law has been given to the jury. *Porter* v. *Lincoln*, 282 Ark. 258, 668 S.W.2d 11 (1984).

█ Under these circumstances, and especially in light of the jury's apportionment of damages, we hold that jury instruction number 19 was not a binding instruction.

## II. Assumption-of-risk instruction

For its second allegation of error, Railway asserts that jury instruction number 22, AMI Civ. 3d 1909 regarding FELA assumption-of-risk, confused the jury by injecting an abstract and inapplicable legal principle into the case, as neither Railway nor Oakley Trucking pleaded or argued the defense that Mr. Grider had assumed the risk of the accident. The trial court instructed the jury as follows:

> At the time of the occurrence there was in force a federal statute which provided that in any action brought against a railroad to recover damages for injury to an employee, the employee shall not be held to have assumed the risks of his employment in any case where the injury resulted in whole or in part from the negligence of any of the officers agent, or employees of the railroad.

The trial court gave this instruction to the jury over Railway's objection, and in denying Railway's motion for new trial, stated that "it is foreseeable, and a juror might believe that a railroad employee assumes the risk of such collisions when he accepts employment under those circumstances." The trial court further remarked that he "d[id] not know why we should not explain to the jury that it should not consider that such an employee assumed the risks of such a collision." On appeal, Railway asserts that it was prejudiced by the giving of jury instruction number 22, stating that the instruction unfairly repeated the FELA standard of liability, while omitting reference to Oakley Trucking or Asplundh.

██ Granted, jury instructions stating abstract legal propo-

sitions without any evidentiary basis should not be given. *Davis* v. *Davis*, 313 Ark. 549, 856 S.W.2d 284 (1993). The comment to AMI 1909 addresses this issue as follows:

> Giving an instruction that the employee has not assumed the risk of his employment has been sustained without regard to whether the defense has been asserted. *Wantland* v. *Illinois Central R. Co.*, 237 F.2d 921 (7th Cir. 1956). It has been held properly refused when that was not an issue. *Blundell* v. *Atchison T. & S. F. R. Co.*, 157 Cal. App. 2d 797, 322 P.2d 66 (1958).

Railway contends that Mr. Grider should be precluded from arguing on appeal that his conduct was at issue in light of the "parties' stipulation of record at the start of trial that Grider's conduct was not in issue." We find no stipulation entered of record on this point; rather, we observe that counsel merely made arguments to the trial court that Mr. Grider's conduct was not at issue. Nevertheless, we agree with Mr. Grider's assertion at oral argument that Railway "smuggled in" evidence of Mr. Grider's conduct at trial, as Railway elicited testimony that, as conductor, Mr. Grider was in charge of the train, that he frequently traveled by the crossing in question, including the day before the accident when he did not notice the weeds, that he did not brace himself before the accident, and that he omitted from his personal injury report that the weeds caused the accident. Under these circumstances, the evidence supported the trial court's decision to give jury instruction number 22, as the jury might have otherwise believed that Mr. Grider assumed the risk of the collision.

### III. Excessive verdict

For its final point of error, Railway asserts that the $1,750,000 jury award to Mr. Grider is excessive. Railway asks for a new trial, and, in the alternative, a remittitur. Oakley Trucking does not request a new trial but states that it would welcome a remittitur. Asplundh agrees with Mr. Grider that the damage award was not excessive. In denying Railway's motion for new trial, the trial judge expressed concern regarding the jury award, noting his surprise at the amount, yet he could not say that it "shocked the conscience of the court."

We have long stated that the jury's verdict will ordi-

narily not be disturbed on appeal unless it is wholly without support in the evidence, is the result of passion or prejudice, or shocks the conscience or a sense of justice. *Price* v. *Watkins*, 283 Ark. 502, 678 S.W.2d 762 (1984). It is true that, in determining the propriety of a jury award, we place "little reliance" on prior decisions. *Mustang Electric Service, Inc.* v. *Nipper*, 272 Ark. 263, 613 S.W.2d 397 (1981). Remittitur is appropriate when the compensatory damages awarded cannot be sustained by the evidence. *Johnson* v. *Gilliland*, 320 Ark. 1, 896 S.W.2d 856 (1995). As Railway appeals from the trial court's denial of its motion for new trial, the test is whether the verdict is supported by substantial evidence, giving the jury the benefit of all reasonable inferences permissible under the proof. *Davis* v. *Davis, supra.*

Mr. Grider testified that, as a result of the accident, he was forced to undergo painful myelograms and two cervical fusion surgeries. He spoke of constant headaches and of his fear that normal activities would cause these headaches and neck spasms. Mr. Grider further related that he often could not sleep at night and that his wife would have to help him by massaging his neck to work out the neck spasms. He reflected that he loved to go hunting, fishing, camping, and water skiing, and that before the accident, he would hunt ducks and deer every day. Since the accident, however, he had only been fishing four times, and when he would shoot a gun, he would "pay for it" with painful muscle spasms. He would suffer when he tried to get up into the deer stand, and had to have friends carry a deer that he had killed out of the woods for him. It was Mr. Grider's further testimony that, when he went back to college, he was unable to complete his courses due to the fact that he "hadn't been in school for 25 years and all the sitting caused some pain." Thereafter, he enrolled in an H & R Block tax course to become a bookkeeper or tax preparer. His wife, Vickie Grider, corroborated much of his testimony, adding that he could no longer do household chores which included working on vehicles, fixing a hot water heater, raking leaves, or driving a vehicle.

The medical testimony offered at trial is as follows: Dr. John Barbaree, a chiropractor who had previously treated Mr. Grider for a knee problem and lower back problem, saw him two days after the accident, at which time Mr. Grider complained of neck stiffness, headaches, left hip pain, and sleeping difficulties. Dr.

Barbaree testified that he prescribed physical therapy and chiropractic adjustments, which included muscle stimulation, heat and massage, and cervical traction. After four visits, Dr. Barbaree referred Mr. Grider to Dr. Zachary Mason, a neurosurgeon. According to Dr. Barbaree, he continued to treat Mr. Grider while he was under the care of other physicians and observed a diminished range of motion in all directions and tightness and tenderness in his neck. It was his opinion that Mr. Grider's long-term prognosis was "poor" due to the number of his symptoms and the length of time they had been present. He opined that Mr. Grider could no longer perform the duties of a railroad conductor, and that his disability for this particular occupation was permanent. As he believed that Mr. Grider would continue to experience headaches and muscle spasms or "flare-ups" two or three times a year, Dr. Barbaree stated that he would need chiropractic treatment for his "chronic problem." He concluded that he disagreed with Dr. Mason's opinion that, after he released Mr. Grider, his soft tissue injury would eventually heal completely.

Dr. Mason testified that Mr. Grider did "fairly well" on his first follow-up visit after a myelogram and subsequent cervical fusion surgery, as he had mild discomfort in his shoulders, weakness in his left arm, and sleeplessness. During his next visit, Dr. Mason observed Mr. Grider's "excellent strength," while recommending a "work hardening" program for loss of motion in his neck. Approximately two months later, Dr. Mason scheduled a second myelogram and a CT scan due to Mr. Grider's complaint that he would develop neck and arm pain when he became active. Based on the results of these tests, Dr. Mason performed a second cervical fusion surgery. Following this procedure, Mr. Grider's left arm strength improved, although he was still having some neck and left shoulder pain. It was Dr. Mason's opinion that, as Mr. Grider's bone graft fused, his symptoms would resolve. At a follow-up MRI, Dr. Mason observed that the fusions in Mr. Grider's neck were "solid" and "looked good," as he saw no disk herniation or pressure on the spinal cord or nerve roots. He then referred Mr. Grider to Dr. Robert Valentine, an anesthesiologist, for chronic pain management, who he expected would find that Mr. Grider was neurologically intact. It was Dr. Mason's diagnosis that Mr. Grider had chronic pain, but that his overall prognosis was "good." He opined that Mr. Grider would

have problems doing different tasks as a conductor based on his "subjective complaints of pain." According to Dr. Mason, the objective data of Mr. Grider's exam did not give him any indication that he would have problems, as there was no physical impairment that would prevent him from doing the tasks; rather, the pain in his muscles and neck would prevent the procedures in question. Dr. Mason concluded that Mr. Grider may need physical therapy and anti-inflammatory medication for muscle spasms, and that Mr. Grider seemed to be "conscientious" during his treatment of him and "genuine" in his complaints.

Dr. Valentine testified that he treated Mr. Grider for "myofascial syndrome." His opinion as to Mr. Grider's prognosis was that he was "probably as good as he's going to be." Dr. Valentine further stated that Mr. Grider could expect to have flare-ups about two or three times a year for the rest of his life, and that he would do well with two weeks of physical therapy in response to the flare-ups. It was Dr. Valentine's testimony that Mr. Grider would not be able to carry heavy loads or to push or pull on heavy things.

Stan Smith, an economist, testified that he calculated Mr. Grider's past wages at $125,441, his future lost wages for 22 years of work at $931,776, and the value of his health, dental, and life insurance benefit payments at $125,439. Crediting approximately $98,000 for a job that Mr. Grider could earn at $6.40 per hour as a bookkeeper, Mr. Smith estimated that, at present value, Mr. Grider's total loss of wages and benefits was $1,110,967.

Neither Railway nor Oakley Trucking presented witnesses relating to Mr. Grider's injuries and resulting damages, but relied upon their examination of Mr. Grider and the witnesses who testified on his behalf.

In reviewing the evidence of Mr. Grider's injuries presented at trial, we do not regard the award of compensatory damages as shocking. In sum, there was no compelling proof of prejudice or influence of such kind as to justify disturbing the jury award. *See B & F Eng'g, Inc.* V. *Cotroneo*, 309 Ark. 175, 830 S.W.2d 835 (1992).

### IV. Directed verdict

On cross-appeal, Oakley Trucking asserts that the trial court

erred in denying its motion for directed verdict. At the close of Mr. Grider's case-in-chief, Oakley Trucking moved for directed verdict "on paragraph four of count II" of Mr. Grider's amended complaint relating to the allegation that Mr. Montgomery's failure to exercise ordinary care or to keep a proper lookout caused the accident. The trial court denied the motion. At the close of all the evidence, Oakley Trucking renewed its motion on the basis that there was "no proof of a substantial nature that Mr. Doyle Montgomery on behalf of Oakley was negligent in proximately causing the accident in question." The trial court once again denied the motion.

A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Mahan v. Hall*, 320 Ark. 473, 897 S.W.2d 571 (1995). Thus, we review the evidence in a light most favorable to Mr. Grider, the non-moving party, and give it its highest probative value, taking into account all reasonable inferences. *Id.* In doing so, we hold that Oakley's Trucking's argument is meritless.

Mr. Montgomery, the driver of the dump truck, testified that he did not stop before he went out on the rails of the crossing, although admitting that this was a "blind" and "dangerous" intersection and that he had stopped at the crossing previously. It was his testimony that, because of the weeds, he could not get a clear view of the railroad track until he was actually in the crossing. Mr. Montgomery further stated that he had traveled through the crossing in question approximately one hundred times in the months before the accident. On the date of the accident, he stated that he was on his fifth load "from the Arkalite plant to the barges," that he got paid by the number of loads he carried, and that this particular route through the crossing was a "short cut" to the barges. At one point during his testimony, Mr. Montgomery stated that "[y]ou can't really stop on a steep incline or you'll tear your clutch out or break the axle." He concluded, during cross-examination, that although the rule in his company's handbook was to stop, look, and listen at train tracks, he did not stop at the tracks when the accident happened.

Deputy James Lemmons testified that he interviewed Mr. Montgomery on the date of the accident. According to Deputy Lemmons, Mr. Montgomery told him that "he was heading east,

and that in order to get over the railroad tracks, he had to get a full head of steam up." Mr. Montgomery testified that he did not recall making this statement to Deputy Lemmons.

Oakley Trucking asserts that Railway's failure to keep the crossing free from weeds and vegetation was the sole and proximate cause of the accident. The jury disagreed, finding Railway 75 percent negligent and Oakley Trucking 25 percent negligent. In reviewing the evidence in the light most favorable to Mr. Grider, we cannot say that the trial court erred in refusing to direct a verdict in Oakley Trucking's favor, as there was substantial evidence that Oakley Trucking's driver, Mr. Montgomery, failed to exercise ordinary care or to keep a proper lookout, which constituted negligence that was a proximate cause of Mr. Grider's injuries.

Affirmed.