Charles L. LONG et al. *v.* Leslie B. LAMPTON and Ergon, Inc.

95-774                                              922 S.W.2d 692

Supreme Court of Arkansas
Opinion delivered May 28, 1996
[Petition for rehearing denied July 1, 1996.*]

*JESSON, C.J., and GLAZE, J., would grant. DUDLEY, J., not participating.

*Shackleford, Shackleford & Phillips, P.A.*, by: *Dennis L. Shackleford* and *Jerry Watkins*, for appellants.

*Wright, Lindsey & Jennings*, by: *Sammye L. Taylor*, for appellees.

ANDREE LAYTON ROAF, Justice. This appeal arises from a minority shareholders' action for breach of fiduciary duty. Appellants Charles Long and other members of the Long family, minority shareholders of Lion Oil Company ("Lion"), filed an action against appellees Ergon, Inc. ("Ergon"), the largest shareholder of Lion, and Leslie B. Lampton, president of both Ergon and Lion, alleging breach of fiduciary duty in the implementation of a corporate recapitalization plan. The Longs appeal a jury verdict in favor of Lampton and Ergon. They assert that the trial court 1) erred in denying a motion for new trial on the ground that the verdict was clearly against the preponderance of the evidence; 2) erroneously instructed the jury that they had the burden of proving Lampton and Ergon owed them a duty as a fiduciary; and 3) erroneously instructed the jury that Lampton and Ergon could rely on the business-judgment rule. In their cross-appeal, Lampton and Ergon raise five points to be addressed only if we reverse on direct appeal. We find no error and affirm.

Charles L. Long and Leslie B. Lampton, as president of Ergon, were among five investors who came together in 1985 to purchase a refinery, pipeline, and other related assets located in El Dorado, Arkansas. Long is one of four brothers involved in various business ventures in Union and Miller Counties, including Long Brothers Oil Company. Ergon is a family owned corporation headed by Lampton and based in Jackson, Mississippi. The new corporation became known as Lion Oil Company. It was determined that $24 million was needed to acquire the refinery and sustain its operation. The longtime attorney of Charles Long also served as counsel for Lion and drafted the Pre-Incorporation Agreement. Under this agreement, each investor was to obtain a letter of credit from a financial institution, in the amount of $2 for each $1 par value subscribed in stock. Of the 8 million shares of stock originally issued, Charles Long invested $1.5 million in cash with a letter of credit from First Commercial Bank ("First Commercial") in the amount of $3 million; he later transferred some of his stock to other members of his family. Ergon invested $4.5 million and provided a $9 million letter of credit. Several other investors were later brought into the corporation; Ergon ultimately owned 43.3% of the stock and the Longs owned 18.6%.

Ergon contracted to manage Lion in exchange for a fee of 20% of the net profits. This management was overseen by Lion's seven-member board of directors, which met monthly and received information concerning all aspects of the refining operation, including financing needs. Long served as chairman of the board from Lion's inception until April 1989. His attorney also served on the board, although he held no stock in the company.

Because Lion's business of refining oil required periodic purchases of crude oil in tanker-size lots, Lion needed to have access to substantial amounts of credit from a commercial lender. Lion originally operated under a $60 million line of credit from General Electric Capital Corporation ("GECC") secured by Lion's inventory, its receivables, and a pledge of the shareholders letter of credit. During the initial four years of operation, the directors periodically discussed eliminating the shareholders letters of credit but decided not to do so because of the need for the additional credit they provided to Lion.

The events which gave rise to this lawsuit and appeal took place primarily between February and September 1989. As the May

1, 1989, expiration date of the financing arrangement with GECC approached, the board directed Lion's chief financial officer to locate a more advantageous line of credit. The board subsequently selected First National Bank of Boston ("Bank of Boston") to replace GECC because its credit line was less expensive and more generous in the valuation it placed on Lion's inventory and receivables. Lion's directors, including Long, voted unanimously on February 28, 1989, to make the change form GECC to Bank of Boston effective May 1, 1989.

Although the Bank of Boston did not require Lion to provide shareholders' letters of credit, it did agree to provide additional credit per dollar of each shareholder letter of credit offered by Lion, therefore making available to Lion an additional $16 million in credit. The Bank of Boston would not accept transfer of the GECC letters of credit, but required the issuance of new letters in its favor or amendments which named it as beneficiary.

The Longs' initial $3 million letter of credit with First Commercial had been issued on July 1, 1985. Although the preincorporation agreement did not set a time limit for the shareholders' letters of credit, the banking institutions which agreed to issue them were told that they would be needed for only three to five years, or until Lion had established sufficient credit on its own. Each shareholders' letter of credit provided that it could be called in the event the lending institution failed on or before April 1 of any year to extend or renew it for an additional year. Therefore, if First Commercial failed to renew the Longs' letter of credit by April 1, this would be considered a default which would allow GECC to demand payment on the letter of credit. If the Longs' letter of credit was called by GECC, First Commercial would in turn demand $3 million from the Longs who could then look to Lion for repayment.

The Longs' letter of credit was renewed for 1988-89 and was "irrevocable and transferable." However, because of certain financial reversals suffered by the Longs, First Commercial advised them in February 1989, that it would not renew their letter of credit for 1989-90. At the March 1989 board meeting, Charles Long told the other board members, including Lampton, of the bank's intention not to renew his letter of credit.

GECC attempted to call the Longs' letter of credit and demanded payment from First Commercial on April 13, 1989.

Upon learning of GECC's call on the letter of credit, Long and his attorney sent correspondence to First Commercial and GECC threatening litigation unless the demand for payment was withdrawn. Lampton learned in a telephone conversation with an officer of First Commercial on April 13, 1989, that First Commercial would agree to extend the letter of credit for one more year, however, he was advised that the letter would be issued as nontransferable. GECC withdrew its demand for payment after the letter of credit was renewed.

At the annual shareholders meeting on April 27, 1989, Lampton was elected chairman of the board to replace Charles Long, who had been chairman since 1985. Two of Lampton's sons and the son of another substantial shareholder were elected to replace three other board members.

Lampton testified that after learning of the Longs' plight at the March Board of Directors meeting, several shareholders complained that it would be unfair for the Longs to maintain the same amount of stock while withdrawing two-thirds of the capital they had agreed to provide because they would or could not renew their letter of credit. According to Lampton, he was requested by other shareholders to find a way to address this inequity. At the April 27, 1989 board meeting, Lampton provided a draft recapitalization plan prepared by Lion's attorneys in Mississippi who had been working on the company's transaction with the Bank of Boston.

The recapitalization plan was approved at a September 1989 shareholders' meeting and granted each shareholder the right to acquire at $.10 per share, one additional share of stock for each dollar in letters of credit placed with the Bank of Boston. According to Lampton, this plan was designed to encourage shareholders to put up new letters of credit by acquiring more stock which could be pledged as collateral. The plan further provided for the number of shares to be increased from 10 million to 30 million followed by a reverse stock split to reduce the number of shares. Because they were unable to put up letters of credit and thereby purchase additional shares of stock, the Longs' 1.5 million shares were reduced to 675,000 and their $1.5 million investment reduced to $675,000. It is this loss in their investment which gave rise to the Longs' action against Lampton and Ergon.

### 1. Motion for new trial

The Longs first argue that the trial court erred in denying their motion for new trial because the verdict was clearly against the preponderance of the evidence regarding Lampton's breach of his fiduciary duty. Lampton, and consequently Ergon, breached their fiduciary duty, according to the Longs, when Lampton failed to either timely advise the Longs that First Commercial would not issue a transferable letter of credit which would have allowed them the opportunity to request a call of the letter of credit, or to act within his authority to require First Commercial to issue a transferable letter of credit.

■ On appeal, this court's standard for reviewing the denial of a motion for new trial is whether there is any substantial evidence to support the jury verdict. *Ray v. Green*, 310 Ark. 571, 839 S.W.2d 515 (1992). In determining the existence of substantial evidence, we must view the evidence in the light most favorable to the appellee. *Egg City of Arkansas, Inc. v. Rushing*, 304 Ark. 562, 803 S.W.2d 920 (1991). Evidence favorable to the appellee is given the benefit of all reasonable inferences permissible under the proof. *Scott v. McClain*, 296 Ark. 527, 758 S.W.2d 409 (1988). Substantial evidence compels a conclusion one way or the other and is more than mere speculation or conjecture. *Ray, supra.*

■ While a trial court has some discretion in setting aside a jury verdict, there is no longer the broad discretion that this court formerly recognized. *Ray, supra.* The trial court is not to substitute its view of the evidence for that of the jury's unless the jury verdict is found to be clearly against the preponderance of the evidence. It is only where there is no reasonable probability that the incident occurred according to the version of the prevailing party or where fair-minded men can only draw a contrary conclusion that a jury verdict should be disturbed. *Blissett v. Frisby*, 249 Ark. 235, 458 S.W.2d 735 (1970).

■ The standard of conduct for directors of a corporation is set out in Ark. Code Ann. § 4-27-830 (Repl. 1996), which provides in pertinent part:

A. A director shall discharge his duties as a director, including his duties as a member of a committee:

1. In good faith;

2. With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

3. In a manner he reasonably believes to be in the best interest of the corporation.

A person standing in a fiduciary relationship with another is subject to liability to the other for harm resulting from a breach of the duty imposed by the relationship. *Cherepski* v. *Walker*, 323 Ark. 43, 913 S.W.2d 761 (1996); Restatement (Second) of Torts § 874 (1979). In the search for inherent fairness and good faith to a corporation and shareholders, conduct of directors must be subjected to "rigorous scrutiny" when conflicting self-interest is shown. *Hall* v. *Staha*, 314 Ark. 71, 858 S.W.2d 672 (1993). The duty of good faith requires "honesty in fact in the conduct or transaction concerned." Ark. Code Ann. § 4-1-201 (Supp. 1995).

The Longs contend that it is significant that First Commercial's Executive Vice President, Ed Henry, told Lampton on April 13, 1989, that the bank would not renew the Long Brothers letter of credit on a transferable basis. They assert that had Lampton brought this to their attention, they could have used the threat of a GECC call to force First Commercial to issue a transferable letter of credit. However, GECC did effectively call Longs' letter of credit with First Commercial. This, of course, would have created a $3 million debt that the Longs would have to repay to First Commercial. The Longs' attorney testified that they asked GECC to not call the letter of credit and threatened litigation against GECC and First Commercial Bank if they continued with this course of action. First Commercial consequently agreed to extend the letter of credit for an additional year, however it was not transferrable and thus terminated upon the expiration of the GECC financing on May 1, 1989. The Longs make much of the fact that an April 14 letter sent by Henry to Lampton confirming their conversation of April 13, and copied to Charles Long and his attorney was not postmarked until May 8, and was not received by them until May 10, after the non-transferable letter of credit had been issued by First Commercial. However, the bank sent this letter, not Lampton, and there was no evidence that Lampton was involved in causing the letter to be delayed. Moreover, although the attorney for the Longs reviewed the Longs' letter upon its renewal, he testified that he did not notice that it was non-transferable.

The Longs argue in the alternative that Lampton should have used his leverage with GECC to force First Commercial to issue a transferable letter of credit. Lampton testified that First Commercial was the Longs' lender — not his or Lion's, and that he felt that it was not his responsibility to tell Long or Long's attorney that he knew that First Commercial was not going to issue a transferable letter of credit.

The Longs also argue that Lampton breached his fiduciary duty because he knew that the Longs were not able to transfer their letter of credit prior to finalizing the arrangement with the Bank of Boston which involved shareholder letters of credit. Even though the Bank of Boston did not originally require shareholder letters of credit, Lion's board concluded that letters of credit were necessary to obtain additional financing and to enable Lion to purchase foreign oil. The Longs' attorney testified that had he thought about it, he would have concluded that because of their financial reversals, the Longs would not be able to extend their letter of credit with First Commercial. Lampton, on the other hand, testified that he had no idea of the Longs' banking connections, and that he assumed that the Longs would be able to obtain a letter of credit from another lending institution. However, because the Longs had experienced financial difficulties since their initial letter of credit was issued by First Commercial in 1985, they were not able to obtain a letter of credit from other lenders. Lampton denied that he devised the recapitalization plan to take advantage of the Longs' financial difficulties, and testified that it was the Longs' threat to sue GECC and First Commercial which caused the Bank of Boston to refuse to accept transfer of the shareholders letters of credit.

■ The weight and value to be given to the testimony of witnesses in such matters is in the exclusive province of the jury. *Ray, supra.* Here, fair-minded persons could conclude that Lampton breached no fiduciary duty in that loyalty and good faith did not compel Lampton to assume, first, that he knew more about the Longs' banking relationships than they did and second, that the Longs, who were represented by an attorney in their dealings with First Commercial, needed him to take over negotiations with the bank to obtain more favorable terms for their letter of credit. As there is substantial evidence to support the verdict, we cannot say that the trial court erred in denying the motion for new trial.

## 2. Duty of a Fiduciary

The Longs next assert that the trial court erred by incorrectly instructing the jury that they had the burden of proving that Lampton owed them a duty as a fiduciary. The trial court instructed the jury that the Longs had the burden of proof as to each of the following four essential propositions:

First: That they have sustained damages.

Second: That Leslie B. Lampton, Sr., owed plaintiffs duties as a fiduciary.

Third: That Leslie B. Lampton, Sr., breached his fiduciary duties to the plaintiffs.

Fourth: That such breach of fiduciary duties was a proximate cause of plaintiffs' damages.

We agree that it was error to instruct the jury that the Longs had the burden of proving that Lampton owed them a duty as a fiduciary.

■ This court has repeatedly stated the issue of what duty is owed, if any, is always a question of law. *First Commercial Trust Co.* v. *Lorcin Eng'g.*, 321 Ark. 210, 900 S.W.2d 202 (1995). Further, it is the duty of the judge to instruct the jury and each party to the proceeding has the right to have the jury instructed upon the law of the case with clarity and in such a manner as to leave no grounds for misrepresentation or mistake. *Dorton* v. *Francisco*, 309 Ark. 472, 833 S.W.2d 362 (1992).

■ An erroneous instruction which is likely to mislead the jury is prejudicial. *Bailey* v. *Rose Care Center*, 307 Ark. 14, 817 S.W.2d 412 (1991). However, we have also held that although we will presume prejudice from the giving of an erroneous instruction, the error may be rendered harmless by other factors in the case. *Davis* v. *Davis*, 313 Ark. 549, 856 S.W.2d 284 (1993); *Skinner* v. *R.J. Griffin & Co.*, 313 Ark. 430, 855 S.W.2d 913 (1993).

During the trial, Lampton testified that "I recognize that I had a duty as a shareholder and a director to Mr. Long is another shareholder. I recognize that I have a duty to treat all of the shareholders fairly and equally in this situation." Lampton also testified that "[a]ll parties have a fiduciary duty, including a duty of fairness and loyalty and not taking advantage of the other."

■   Lampton's counsel also admitted the existence of such a duty in his closing argument:

> We do not deny that Mr. Lampton had a duty. He had a duty to the other shareholders, to the other directors, to his corporation as a company, including all of its employees. . . . So, we do not deny that element. We will concede, and do not dispute that a duty existed.

Finally, the following instruction was given immediately after the charge which erroneously advised that the Longs had the burden of proving that Lampton owed them a duty:

> Directors, officers and shareholders of a corporation owe fiduciary duties of care, good faith and loyalty to each other.

In *St. Louis Southwestern Railway Co.* v. *Grider*, 321 Ark. 84, 900 S.W.2d 530 (1995), this court stated that jury instructions should not be reviewed in isolation, but rather considered as a whole in determining whether the applicable law has been given to the jury.

■   In the present case, the testimony of Lampton and the statements of his counsel, along with the instruction which advised the jury of the fiduciary duty owed by directors, officers, and shareholders of a corporation rendered harmless the erroneous instruction.

### 3. Business-judgment rule

For their third point, the Longs contend that the trial court erred by instructing the jury that Lampton and Ergon may rely on the business-judgment rule. The trial court gave the following instruction over the objection of the Longs:

> The Business Judgment Rule is a presumption that in making a business decision, the directors or officers of a corporation acted on an informed basis in good faith and in an honest belief that the action was in the best interest of the corporation. Here defendants may rely on the protection of the Business Judgment Rule if they establish by a preponderance of the evidence that there was a predominating corporate purpose for their actions and that they acted in good faith.

■ This court has stated that two elements must be satisfied in order for the business-judgment rule to be invoked. First, its protection can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. Second, to invoke the rule, directors have a duty to inform themselves of all material information reasonably available to them prior to making a business decision. Having become so informed, they must then act with requisite care in discharge of their duties. *Hall* v. *Staha*, 303 Ark. 673, 800 S.W.2d 396 (1990).

The Longs argue that Lampton and Ergon were not entitled to this instruction because they were not disinterested. This contention was also raised in *Smith* v. *Leonard*, 317 Ark. 182, 876 S.W.2d 266 (1994). However, in *Smith*, we affirmed the chancellor's determination that there was a predominating corporate purpose for the transaction, even though Leonard also received a benefit.

■ We further agree with the Court of Appeals of Ohio that "disinterested directors" does not mean indifferent directors, or directors with no stake in the outcome. *Koos* v. *Cent. Ohio Cellular Inc.*, 641 N.E.2d 265 (Ohio App. 8 Dist 1994). If that were so, shareholders could never be directors or officers. *Id.* Disinterested directors are those who "neither appear on both sides of the transaction nor expect to derive any person financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. *Id.* The decisions of disinterested directors will not be disturbed, according to *Koos*, if they can be attributed to any rational business purpose. *Id.* Self-interest, alone, is not a disqualifying factor even for a director. *Cede & Co.* v. *Technicolor, Inc.* 634 A.2d 345 (Del. 1993). To disqualify a director, for rule rebuttal purposes, there must be evidence of disloyalty. *Id.*

Under the recapitalization plan, the Longs and all other Lion shareholders had the right to purchase additional shares of Lion stock on the basis of letters of credit provided for the benefit of the Bank of Boston. By giving all shareholders the right to purchase additional shares at $.10 per share, the plan provided a means of obtaining additional collateral for a letter of credit. Lampton testified that even if a shareholder could not obtain a letter of credit, stock purchase rights could be sold to recoup some of the investment. Clearly, any benefit from the recapitalization plan flowed not only to Lampton and Ergon, but to all other shareholders as well.

■ Moreover, the trial court instructed that Lampton and Ergon were not entitled to rely on the business-judgment rule unless there appeared to be a predominant corporate purpose for their actions. Lampton testified to several reasons for the recapitalization plan. Other shareholders were unwilling to allow the Longs to maintain their percentage of interest in Lion if they did not put up a letter of credit, and threatened to also not renew their letters of credit. The letters of credit were deemed necessary by the board because they allowed Lion to obtain a larger line of credit with the Bank of Boston. Individual shareholders were able, through the plan, to increase their amount of collateral in the company, and thereby increase the amount of stock owned by each shareholder. Each shareholder, not just Ergon, was able to benefit from this plan. Consequently, we cannot say that the trial court erred in allowing reliance on the business-judgment rule.

### 4. Cross-appeal

On cross-appeal, Lampton and Ergon raise five points to be addressed only if the judgment is reversed on direct appeal. Since we affirm on direct appeal, we do not consider the issues raised in the conditional cross-appeal.

Affirmed on direct appeal; cross-appeal moot.

JESSON, C.J., and GLAZE, J., dissent.

DUDLEY, J., not participating.

TOM GLAZE, Justice, dissenting. Trial attorneys and members of the bench should take particular note of this decision, because it represents this court's change in case law involving the giving and prejudicial effect of (1) erroneous conflicting jury instructions and (2) inherently erroneous instructions. As this court ruled in *Alpha Zeta Chapter of Pi Kappa Alpha Fraternity v. Sullivan*, 293 Ark. 576, 740 S.W.2d 127 (1987), it is settled law that it is prejudicial error for the court to give instructions which are directly conflicting and calculated to mislead the jury. *See also Chicago Mill & Lumber Co. v. Johnson*, 104 Ark. 67, 147 S.W. 86 (1912); *McCurry v. Hawkins*, 83 Ark. 102, 103 S.W. 600 (1907); *St. Louis, I.M.& S. R. Co. v. Beecher*, 65 Ark. 64, 44 S.W. 715 (1898). It is also well settled that an inherently erroneous instruction cannot be cured by a correct instruction. *MoPac Railroad Co. v. Boley*, 251 Ark. 964, 477 S.W.2d 468 (1972); *Clark v. Duncan*, 214 Ark. 83, 214 S.W.2d 493 (1948);

*Reynolds* v. *Ashabranner*, 212 Ark. 718, 207 S.W.2d 304 (1948); *Mo. Valley Bridge & Iron Co.* v. *Malone*, 153 Ark. 454, 240 S.W. 719 (1922). Believe it or not, the majority court has decided in this case today that inherently erroneous and directly conflicting instructions are no longer presumed prejudicial error.

This case centers on a dispute between the majority shareholders, Leslie Lampton, Sr., and Ergon, Inc., and the minority shareholders, the Longs, and whether the majority and its management representatives breached their fiduciary duties owed the Longs. While the question as to whether Lampton and the other majority shareholders owed the Longs a duty as a fiduciary is a matter of law, the trial court erroneously submitted this question as a factual issue in instruction no. 9 as follows:

> *Plaintiffs* claim damages from Ergon, Inc. and Leslie B. Lampton, Sr., and have the *burden* of *proving each of four essential propositions*:
>
> First: That they have sustained damages.
>
> Second: That Leslie B. Lampton, Sr., *owed plaintiffs duties as a fiduciary.*
>
> Third: That Leslie B. Lampton, Sr., breached his fiduciary duties to the plaintiffs.
>
> Fourth: That such breach of fiduciary duties was a proximate cause of plaintiffs damages.
>
> *If you find from the evidence in this case that each of the propositions has been proved, then your verdict should be for the plaintiffs and against the defendants Leslie B. Lampton, Sr., and Ergon, Inc. But, on the other hand, you find from the evidence that any of these propositions has not been proved then your verdict should be for Ergon, Inc., and Leslie B. Lampton, Sr.* (Emphasis added.)

As can be seen by the foregoing language (and as pointed out by the Longs), the jury is told that, if it finds each of the four essential conditions to exist (including Lampton owed the Longs duties as a fiduciary), the jury should return a verdict for the Longs. But if the jury finds that any one of the four propositions has not been proved, the jury's verdict should be for Lampton and Ergon. In other words, the instruction in effect "binds" the jury to return a verdict based

only on such instruction. *See Reynolds* v. *Ashabranner*, 212 Ark. 718, 207 S.W.2d 304 (1948).

Lampton and Ergon concede the second paragraph in instruction no. 9 is incorrect, but contend that mistake was cured in two ways: (1) In their closing argument, they said, "We do not deny that Mr. Lampton had a duty.", and (2) instruction no. 10 cured any defect in no. 9 by informing the jury, "Directors, officers and shareholders of a corporation owe fiduciary duties of care, good faith and loyalty to each other."

Lampton's and Ergon's two contentions are without merit for several reasons. One, the jury rendered a general verdict in Lampton's behalf, and under the erroneous second paragraph and binding effect of instruction no. 9, the jury may well have reached its verdict by finding Lampton, Sr. owed no fiduciary duty to the Longs. Two, while Lampton and Ergon argue instruction no. 10 cured the error in no. 9, I would first point out that no. 10 gave only a general statement of law, and it never stated that, as a matter of law, Lampton and Ergo owed any fiduciary duties to the Longs. Concerning Lampton's and Ergon's contention that they cured the erroneous portion of instruction no. 9 by not denying they owed the Longs fiduciary duties, I note that they offer no citation of authority supporting such an argument and I am aware of none. Four, it is also difficult to understand any logic in Lampton's and Ergon's (now this court's) argument that the error in instruction no. 9 was cured by no. 10. Assuming instruction no. 10 was intended to relate to the jury that Lampton owed fiduciary duties to the Longs, it still directly conflicts with the directions given in no. 9.

In sum, instruction no. 9 contained an obvious mistake which is conceded by all parties. Assuming, as we must, the jury followed the direction in that erroneous instruction, the jury could well have decided in Lampton's favor because it found Lampton and Ergon owed the Longs no fiduciary duties. No other instruction could cure such an error.

Finally, I need to mention the majority opinion's unfortunate citations to cases such as *Bailey* v. *Rose Care Center*, 307 Ark. 14, 817 S.W.2d 412 (1991); *Davis* v. *Davis*, 313 Ark. 549, 856 S.W.2d 284 (1993); and *Skinner* v. *R. J. Griffin & Co.*, 313 Ark. 430, 855 S.W.2d 913 (1993), in support of the court's assertion that the error committed here could be harmless. Those cases have nothing to do with

a binding or an inherently erroneous instruction as we have before us here. Again, inherently erroneous instructions *cannot* be cured, and Arkansas law has so held for a century. It is disappointing this court fails to recognize this simple distinction when reviewing civil instructions.

For the above reasons, I would reverse and remand this cause.

JESSON, C.J., joins this dissent.